No. 21-13527

# United States Court of Appeals

*for the*

# Eleventh Circuit

GUATEMION JUAN MOSLEY,

*Plaintiff-Appellant,*

— v. —

PRESTON CYCLES WEST, LLC d.b.a. Thunder Tower West Harley-Davidson,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA IN CASE NO. 1:19-CV-03937-SCJ
HONORABLE STEVE C. JONES, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFF-APPELLANT

JERMAINE A. WALKER
HKM EMPLOYMENT ATTORNEYS LLP
*Attorneys for Plaintiff-Appellant*
3355 Lenox Road NE, Suite 705
Atlanta, Georgia 30326
(404) 301-4022

**IN THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT
APPEAL NO. 21-13527-G**


**GUATEMION MOSLEY,**

     **Plaintiff-Appellant,**

**v.**

**PRESTON CYCLES WEST, LLC,
d/b/a THUNDER TOWER WEST
HARLEY-DAVIDSON**

     **Defendant-Appellee**


**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the undersigned counsel of record for Guatemion Mosley certify that the following persons or entities have an interest in the outcome of this particular case or appeal:

1.   Anand, Justin; United States Magistrate Judge USDC N.D. Ga.;

2.   Drew Eckl & Farnham, the law firm representing Appellee;

3.   HKM Employment Attorneys LLP, the law firm representing Appellant;

4.   Jones, Steve; United States District Judge—USDC N.D. Ga.;

5.   Mosley, Guatemion; Plaintiff-Appellant;

6.   Preston Cycles West, LLC; Defendant-Appellee.

C-1

Appellant has no knowledge of Appellee's subsidiaries, conglomerates, affiliates, parent corporations or publicly held corporations that own 10% or more of Appellee's stock or any other identifiable entity related to Appellee with an interest in the outcome of this matter.

Respectfully submitted this 16th day of November 2021.

*/s/Jermaine A. Walker*
Jermaine "Jay" Walker
HKM Employment Attorneys LLP
3355 Lenox Rd., Suite 705
Atlanta, GA 30326
Telephone: (404) 301-4020
Attorney for Plaintiff-Appellant

## **STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is requested on the grounds that the decisional process will be significantly aided by oral argument.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF SUBJECT-MATTER AND APPELLATE
JURISDICTION...........................................................................................1

STATEMENT OF THE ISSUES...................................................................1

STATEMENT OF THE CASE.......................................................................2

     (i)     The Course of Proceedings and Dispositions in the Court
            Below...........................................................................................2

     (ii)    Statement of the Facts ...........................................................4

            1.     Mike Davis' personal observations of Mr. Lewis' racially
                    hostile remarks and behavior toward, against, and
                    concerning Mr. Mosley and other African Americans ..............6

            2.     Tammie Landis' personal observations of Mr. Lewis'
                    racially hostile remarks and behavior toward African
                    Americans ...........................................................................7

            3.     Jameson Previte's personal observations of Mr. Lewis'
                    racially hostile remarks and behavior toward African
                    Americans ...........................................................................8

            4.     Mr. Lewis initiates and recommends Mr. Mosley's
                    termination of employment from the Dealership.......................9

     (iii)   Statement of the Standard or Scope of Review for Each
             Contention ..............................................................................12

SUMMARY OF ARGUMENT .............................................................12

ARGUMENT AND CITATIONS OF AUTHORITY ...........................14

     I.     The District Court's grant of summary judgment to Defendant
           should be reversed because it expressly weighed the evidence
           to reach its conclusion that a reasonable jury *could not find*,
           based on the totality of the circumstances, that Defendant's
           decision to terminate Plaintiff was motivated by his race,
           opposite to the summary judgment requirement.................................14

i

II.     If this Court does not reverse the District Court solely on the fact that it did not apply the correct summary judgment standard, then, by applying the correct standard, this Court should deny Defendant's motion for summary judgment on Plaintiff's claim that his race was a motivating factor in Defendant's decision to terminate his employment ............................ 17

    a.     Suspicious timing ....................................................... 18

    b.     Other evidence from which an inference of discrimination can be drawn or bits and pieces of evidence ...................................................................... 20

    c.     Defendant's reasons for Plaintiff's termination are ambiguous and pretextual ........................................... 21

    d.     Defendant's general manager's racial hostility and animus toward Mr. Mosley resulted in a biased recommendation that was followed by the final decision-maker without independent investigation ................. 24

        1.     Cat's paw vicarious liability ............................. 24

        2.     Cat's paw proximate cause liability ............................... 26

CONCLUSION ...................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L. by and through D.L. v. Walt Disney Parks and Resorts US, Inc.*,
  900 F.3d 1270 (11th Cir. 2018) .....................................................14

*Alston v. Swarbrick*,
  954 F.3d 1312 (11th Cir. 2020) ....................................................12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................14, 17

*Ash v. Tyson Foods*,
  546 U.S. 454 (2006)....................................................................21

*Banks v. MarketSource, Inc.*,
  2020 WL 6291422 (N.D. Ga. March 20, 2020) ...........................15

*Bryant v. Jones*,
  575 F.3d 1281 (11th Cir. 2009) .....................................................2

*\*Holley v. Georgia Department of Corrections*,
  845 Fed. Appx. 886 (11th Cir. 2021) .....................................24, 27

*Jones v. UPS Ground Freight*,
  683 F.3d 1283 (11th Cir. 2012) ...................................................17

*\*Lewis v. School Board of Palm Beach County, Florida*,
  850 Fed. Appx. 674 (11th Cir. 2021) .....................................15, 17

*Llampallas v. Mini-Circuits Lab, Inc.*,
  163 F.3d 1236 (11th Cir. 1998) ...................................................24

*Ross v. Rhodes Furniture, Inc.*,
  146 F.3d 1286 (11th Cir. 1998) ...................................................21

*Skop v. City of Atlanta*,
  485 F.3d 1130 (11th Cir. 2007) ...................................................15

*\*Smith v. Lockheed-Martin Corp.*,
  644 F.3d 1321 (11th Cir. 2011) ...................................................18

*\*Staub v. Proctor Hospital*,
  562 U.S. 411 (2011)..............................................................26, 27

*Stimpson v. City of Tuscaloosa,*
    186 F.3d 1328 (11th Cir. 1999) .....................................................................24

*\*Strickland v. Norfolk Southern Ry. Co.,*
    692 F.3d 1151 (11th Cir. 2012) ....................................................................16

*Thomas v. Home Depot USA, Inc.,*
    731 Fed. Appx. 889 (11th Cir. 2019) ...........................................................23

*White v. Dixie,*
    741 Fed. Appx. 649 (11th Cir. 2018) ...........................................................21

**Statutes & Other Authorities:**

28 U.S.C. § 41 .................................................................................................1

28 U.S.C. § 1291 .............................................................................................1

42 U.S.C. § 1981 ........................................................................................2, 3

42 U.S.C. § 2000e ...........................................................................................2

*Black's Law Dictionary* (11th ed., 2019)...............................................16, 17

Fed. R. App. P. Rule 4(a)(1) ..........................................................................1

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This appeal was timely filed under Fed. R. App. P. Rule 4(a)(1). This Court has subject-matter and appellate jurisdiction for this appeal pursuant to 28 U.S.C. §1291 and 28 U.S.C. §41 because this is an appeal from a final decision of a federal district court of the State of Georgia.

## STATEMENT OF THE ISSUES

1.    Did the District Court commit error, concerning its application of the motion for summary judgment standard, by weighing the evidence and reaching a conclusion that the evidence *could not* allow a reasonable jury to find that Defendant's race was a motivating factor in its decision to terminate Plaintiff's employment, as opposed to determining whether there was sufficient circumstantial evidence in the record, considered as a whole and viewed in the light most favorable to Plaintiff, to create a genuine dispute of fact as to whether race was a motivating factor in the decision to terminate his employment?

2.    If the correct standard concerning a motion for summary judgment standard is whether there was sufficient circumstantial evidence in the record, considered as a whole and viewed in the light most favorable to Plaintiff, to create a genuine dispute of fact as to whether race was a motivating factor in the decision to

1

terminate his employment, should Defendant's motion for summary judgment on Plaintiff's race discrimination termination claim be denied?

## STATEMENT OF THE CASE

The claim on appeal before this Court concerns Plaintiff-Appellant's claim that Defendant-Appellee terminated his employment as a motorcycle sales associate on the basis of his race (i.e., his race was a motivating factor in the decision) in violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. §2000e *et. seq.* ("Title VII") and 42 U.S.C. §1981 ("Section 1981").[1]

### (i)    The Course of Proceedings and Dispositions in the Court Below

On August 31, 2019, Guatemion "Juan" Mosley ("Plaintiff," "Appellant," or "Mr. Mosley"), by and through his undersigned attorney, filed a civil complaint against Preston Cycles West, LLC, d/b/a Thunder Tower West Harley-Davidson ("Defendant," "Appellee," or "the Dealership") in the United States District Court for the Northern District of Georgia, Atlanta Division, alleging, in relevant part, that Defendant terminated his employment on the basis of race in violation of Title VII. (USDC ND Ga. Docket (hereafter "Dkt.") No. 1.)  On April 10, 2020, Plaintiff filed

---

[1] For purposes of this brief, Appellant relies on the same facts and arguments concerning his Title VII claim for his Section 1981 claim since the same legal framework applies. *See Bryant v. Jones, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009)* (holding that claims brought pursuant to Section 1981 are subject to the same legal framework as Title VII claims).

an amended civil complaint against Defendant that, in relevant part, added a Section 1981 claim against Defendant, alleging that it terminated his employment on the basis of race, color, or ethnicity. (Dkt. No. 27.)

On July 30, 2021, U.S. Magistrate Judge Justin S. Anand issued a Final Report and Recommendation ("R&R") that, in relevant part, denied Defendant's motion for summary judgment on Plaintiff's claims of race discrimination and recommended that these claims should proceed to trial. (Dkt. 85, p. 51.) On August 13, 2021, Defendant filed an objection to Judge Anand's R&R concerning this recommendation. (Dkt. 88.) On August 27, 2021, Plaintiff filed a reply to Defendant's objection that its motion for summary judgment on Plaintiff's claims of race discrimination should be denied and that the claims should proceed to trial. (Dkt. 90.) On September 10, 2021, U.S. District Judge Steve Jones issued an order that, in relevant part, rejected Judge Anand's R&R insofar as it recommended denying Defendant's motion for summary judgment as to Plaintiff's claims of race discrimination. (Dkt. 91.) This Order was a final order of the Court, as Judge Jones directed the Clerk to enter judgment in favor of Defendant and to close the case. (Dkt. 91, p. 17.) In the District Court Judge's Order, he expressly ruled that: "In this case, the Court finds that the totality of the circumstances *could not* allow a reasonable jury to find that Defendant fired Plaintiff because he is Black. Thus, the

Court finds that Defendant's objections are due to be sustained, and the R&R is due to be rejected as to Count III."  (Dkt. 91, p. 17.)

**(ii)  Statement of the Facts**

Mr. Mosley is an African American male who began working for Defendant in April 2017 as a full-time motorcycle sales associate at Defendant's Thunder Tower West Harley-Davidson dealership located in Morrow, Georgia.   (Gene Preston Deposition "G. Preston Dep.," p. 13 and Exh. 1.)  Mr. Mosley was a stellar motorcycle sales associate.   In his first six months on the job, he became the top-selling associate at the Dealership.  (Clarence Moon Affidavit "Moon Aff.," ¶3 and G. Preston Dep., p. 30:10-15.)   Remarkably, by October 2018, he had sold 98 motorcycles, having a total sales list price of $2,029,969.73.  (G. Preston Dep., p. 23 and Exh. 3.)  The 98 units sold by Plaintiff generated a gross profit to Defendant of $368,982.42.  (G. Preston Dep., p. 23 and Exh. 3.)

Clarence Moon began working for the Dealership in February of 2017 as its motorcycle sales manager.  (Moon Aff. ¶3.)  During his employment, he managed Mr. Mosley and other motorcycle sales associates.  (Moon Aff. ¶4.)  Based on his personal experience of managing Mr. Mosley, he described him as an "exemplary employee" who would "often go above and beyond the call of duty to perform his primary job, which was to sell motorcycles." (Moon Aff. ¶5.)

In March 2018, Defendant hired Jeff Lewis ("Lewis") to be the Dealership's general manager. (Robert Hammers Declaration "Hammers Dec.," ¶28; Gene Preston Declaration "G. Preston Dec.," ¶24.) Mr. Lewis is Caucasian. (Mike Davis Affidavit "Davis Aff.," ¶3.) The Dealership is owned by Gene Preston, an African American. (G. Preston Dep., pp. 72-73.) Mr. Preston had a "hands-off" approach to his management of the Dealership. (Mosley Dep., pp. 150:23-151:4.) For example, Mr. Preston did not regularly review the sales of motorcycles associates or approve the final sales tally for motorcycle sales associates, necessary for the payment of their commissions. (G. Preston Dep., p. 27:2-9 and p. 29:11-20.) Conversely, as general manager of the Dealership, Mr. Lewis was the Dealership's operator; he was responsible for all departments within the Dealership, and he managed the Dealership on a day-to-day basis. (G. Preston Dep., p. 27:10-15; Betty Preston Deposition "B. Preston Dep.," p. 25:6-14; Mosley Dep., pp. 150:23-151:4; Davis Aff., ¶3.) Jameson Previte, a Caucasian male who worked for the Dealership as its finance manager from June 2017 through May 2018, describes Mr. Lewis' role as general manager as follows:

> "A lot of the times when somebody comes to a job at first, especially when it comes to the sales world, whether cars or automobiles, it's my experience that they all have good intentions. A lot of them say the right things. But as he came in and said the right things, I believe that *Mr. Gene and the ownership group had taken more of a hands-*

5

*off approach to Jeff.* You know, after he essentially made them aware of what his plans were." (Deposition of Jameson Previte "Previte Dep.," p. 42.) (Emphasis added.)

Mr. Previte further explained that "upon Jeff Lewis being hired at the Dealership,

[he] noticed basically everything was going downhill." (Previte Dep., p. 9.)

1. **Mike Davis' personal observations of Mr. Lewis' racially hostile remarks and behavior toward, against, and concerning Mr. Mosley and other African Americans**

Mike Davis, an African American male who worked as a motorcycle sales associate for the Dealership from January 2018 through June 2019, observed that from the beginning and throughout Mr. Lewis' employment at the Dealership, he engaged in overtly racially hostile behavior against and concerning African American employees and customers, including Mr. Mosley.

Mr. Davis observed that while working with Mr. Lewis, he personally heard Mr. Lewis make many racially offensive, hostile, and demeaning statements about and toward Black employees at the Dealership. He personally heard and specifically recalls Lewis regularly saying that Sales Manager Leonard Baker—an African American male—and Mr. Mosley were "shucking and jiving" to describe various work they were performing at the Dealership. (Davis Aff., ¶4(a).) Mr. Davis also heard Mr. Lewis specifically insulting Mr. Mosley by saying that he looked like he was someone from the street because of the loose and baggy clothes he wore to work. (Davis Aff., ¶4(b).) Mr. Davis also heard Lewis call Mr. Mosley a "homeboy" and

say that "he was blacker than the rest of [the African American employees] because he was acting like a street person." (Davis Aff., ¶4(c).) On several occasions, Mr. Davis also observed Mr. Lewis being very condescending, dismissive, and crass toward Mr. Mosley. (Davis Aff., ¶5.) Mr. Davis regularly observed Mr. Lewis insulting and berating. Mosley for minor and trivial things and described Mr. Lewis' conduct toward Mr. Mosley as "horrible." (Davis Aff., ¶5.)

Mr. Lewis' racially hostile remarks were not exclusive to Mr. Mosley. Mr. Davis also personally heard him repeatedly make derogatory statements about Black customers having bad credit. Davis specifically remembers Lewis referring to a Black customer as a "credit criminal" and remembers hearing that the Dealership was audited concerning charging Black customers higher interest rates than white customers. (Davis Aff., ¶6 and ¶7.)

### 2. Tammie Landis' personal observations of Mr. Lewis' racially hostile remarks and behavior toward African Americans

Tammie Landis is an employee of the Dealership who began working there in April 2018. (Mosley Dep., Exh. 27 and Previte Dep., p. 29.) On May 25, 2018, she filed a complaint with Human Resources concerning Mr. Lewis' racially hostile remarks concerning African American customers. (Mosley Dep., Exh. 27 and Previte Dep., p. 29.) In her complaint, she made the following statement:

> "[I]t pains me to send this correspondence. I'm in Sales and made a mistake on the job recently. As I was assisting a coworker with a

7

sale, I let the customer leave the store before the sale was complete.
My Sales Manager Leonard gave me some immediate corrective
instruction, which I greatly appreciated. My GM Jeff [Lewis],
however, did not offer the same. Instead, Jeff asked me if the
customer was white or Black. I'm unsure if he was insinuating that
race would play a part [in] whether or not the customer would
actually be back or if race determined if he lived in the area. Either
way, I was deeply offended by his racial profiling and found it
difficult to maintain my professionalism in that moment." (Mosley
Dep., Exh. 27.)

### 3.    Jameson Previte's personal observations of Mr. Lewis' racially hostile remarks and behavior toward African Americans

Mr. Previte corroborates Ms. Landis' observations concerning Mr. Lewis'

racially hostile remarks about African American customers.  During his employment

at the Dealership, Mr. Previte witnessed Mr. Lewis frequently asking Ms. Landis

about the race of a customer.  Mr. Previte observed the following:

"Very frequently, a customer would have to require [sic] paystubs
in order to prove to the bank that they were the employee of that
income. I heard Jeff ask one of the sales managers,[ ]Tammy, what
the color of the customer's skin was. You know, he was trying to
infer, [ ] whether or not the customer was reliable enough to come
back or produce the paystubs." (Previte Dep., pp. 11-12.)

Mr. Previte also corroborates Mr. Davis' observation that Mr. Lewis

expressed hostility and aversion toward African Americans concerning the clothes

he saw them wear that he ascribed to African American culture. (Previte Dep., pp.

17-18 and 20-21.)  During his deposition, Mr. Previte attested that he recounted that

one day, while at work, Mr. Lewis cornered him on the way out of the bathroom and,

8

after physically blocking him, told him that "his clothing did not fit the culture of the Dealership, and that he looked like one of the Dealership's customers", which was a predominately African American clientele.  (Previte Dep., pp. 17-18.)  Mr. Previte viewed Mr. Lewis' racially tinged comments to him about his clothing as an expression of hostility toward African Americans.  (Previte Dep., pp. 20-21.)  At his deposition, Mr. Previte commented that he did not respond to Mr. Lewis' derisive statements because he did not want to be threatened or fired by Mr. Lewis, so he walked away.  (Previte Dep., p. 27.)

### 4. Mr. Lewis initiates and recommends Mr. Mosley's termination of employment from the Dealership

In April 2018, less than two months into his position as general manager, Mr. Lewis initiated the termination of Mr. Mosley's employment by first contacting Defendant's Human Resources manager, Jeanne Chambers.   During deposition, Jeanne Chambers testified: "*The department manager contacted me and let me know that he wanted to let Juan go.  Of course, my first question is why.  And after that, I explained to him that I could not give him authority, but he needed to take it to Mr. Preston and talk to him about it because he is the only person that could finalize a hire or a termination.*"  (Chambers Deposition "Chambers Dep.," p. 36.) (Emphasis added.)   Ms. Chambers specifically identified Mr. Lewis as the department manager/general manager who made the recommendation to terminate Mr. Mosley's employment.  (Chambers Dep., p. 36.)

9

Ms. Chambers worked remotely from a South Carolina office. (Chambers Dep., p. 7.) At her deposition, when asked, "Did anyone else call you and talk to you about wanting to terminate Mr. Mosley's employment, or was Mr. Lewis the only person?", Ms. Chambers responded, "*Mr. Lewis was the only person.*" (Chambers Dep., p. 37.) (Emphasis added.) Ms. Chambers recalled that, during her phone call with Mr. Lewis, he recommended terminating Mr. Mosley's employment, allegedly for failing to participate in the requirements of his job. (Chambers Dep., p. 47.)

Mr. Lewis indeed made a recommendation to Mr. Preston to terminate Mr. Mosley's employment. At his deposition, Mr. Preston testified as follows: "[Question]: And how did you—was there a recommendation made to you to terminate Mr. Mosley's employment? [Answer]: Yes, sir. [Question:] And who did that recommendation come from? [Answer:] To me, it would have been directly from the general manager and the general sales manager. They would have—they jointly presented their concerns and their case for us separating. [Question:] And to the best of your recollection, what concerns did the general manager, who I assume was Jeff Lewis—[Answer:] Yes, sir." (G. Preston Dep., p. 32.) Mr. Preston further testified that the reasons Lewis provided to him for Mr. Mosley's termination were, allegedly, excessive tardiness, excessive absenteeism, unwillingness to cooperate as part of a team in training sessions and generally not participating in day-to-day

10

routine operation of the Dealership.  (G. Preston Dep., pp. 32-33.)  There is no evidence that Mr. Preston independently investigated each reason Mr. Lewis told him he was relying upon for his recommendation to end Mr. Mosley's employment with the Dealership.

On April 18, 2018, Mr. Mosley was called into a meeting held at the Dealership by Mr. Hammers and Mr. Lewis and was told that he was being let go. (Mosley Dep., p. 156.)  When Mr. Mosley responded, "Why?", Mr. Hammers responded, "We are moving in a different direction."  (Mosley Dep., p. 156.)  Mr. Mosley then said, "What did I do?"  Mr. Hammers responded, "You didn't do anything.  We are just moving in a different direction."  (Mosley Dep., p. 156.)  Mr. Mosley's termination letter provides no reason whatsoever for his termination. (Mosley Dep., Exh. 20.)

At his deposition, Mr. Previte testified the following occurred the day after Mr. Mosley was terminated, after a morning meeting:

> "I walked up to Jeff to ask him a question after the morning meeting. Danny had asked him what [sic] with Juan, and what I heard next was appalling.  Jeff told Danny that Juan wouldn't listen to a thing I said to him.  He wouldn't even look at me while I was talking.  Plus, he wanted to wear FUBU to work every day.  Jeff's only purpose of this comment was to specify that Juan looked too urban for his liking. I'd never seen him wear anything other than Harley-Davidson clothing while on the clock."  (Previte Dep., p. 11.)

11

Mr. Previte further testified that by using the word FUBU, which is a brand of clothing created by an African American, in addition to the derisive comments that were made to him about the type of clothing Previte wore, "[a] reasonable conclusion was come to by myself and the people that were around him that he was making racial [sic] incited comments." (Previte Dep., p. 20.)

Following his termination, Mr. Mosley applied for unemployment benefits with the Georgia Department of Labor ("GDOL"). On April 22, 2018, GDOL issued a determination that concluded: "Your employer fired you. The available facts show that you were performing the duties for which you were hired. The facts show that you did not fail to follow employer's rules, orders or instructions." (G. Preston Dep., Exh. 13.)

### (iii) Statement of the Standard or Scope of Review for Each Contention

A *de novo* standard of review applies to Appellant's contentions concerning whether the District Court committed an error when it applied the motion for summary judgment standard and whether Defendant's motion for summary judgment on Plaintiff's race discrimination termination claim should be denied. *Alston v. Swarbrick 954 F.3d. 1312, 1317 (11th Cir. 2020).*

## <u>SUMMARY OF ARGUMENT</u>

The District Court's grant of summary judgment to Defendant should be reversed because it expressly weighed the evidence to reach its conclusion that a

reasonable jury *could not find,* based on the totality of the circumstances, that Defendant's decision to terminate Plaintiff was motivated by his race.  Applying the correct summary judgment approach results in a finding that there is sufficient circumstantial evidence in the record, when considered as a whole and viewed in the light most favorable to Mr. Mosley, to create a genuine dispute of fact as to whether the decision to terminate his employment was motived by Mr. Mosley's race.

Under the convincing mosaic of circumstantial evidence test applicable to the evaluation of employment discrimination claims, a triable issue of fact exists if the record, viewed in the light most favorable to the Plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker (i.e., that race was a motivating factor in the decision to terminate Mr. Mosley's employment).  In the present case, the suspicious timing of Mr. Mosley's termination from the Dealership (i.e., within a month after Mr. Lewis' arrival as general manager); the ambiguous and conflicting statements surrounding the reasons for Mr. Mosley's termination; the overt direct expressions of derision, aversion, and hostility concerning and toward African American employees and specifically directed at Mosley; as well as evidence that Defendant's justifications are pretextual all serve as evidence that would allow a jury to infer that race was a motivating factor in the decision to terminate Mr. Mosley's employment.  Additionally, there is sufficient evidence that would allow a jury to conclude that

because Mr. Lewis made a recommendation to the owner of the Dealership, infused with bias and racial animus, and the owner followed the recommendation without independently investigating each claim serving as the basis of Mr. Lewis' recommendation for the termination, Defendant can be held liable for Mr. Lewis' hidden discriminatory motives.  Lastly, and alternatively, there is sufficient evidence to conclude that as a supervisor, Mr. Lewis performed an action motivated by animus (i.e., recommending Mr. Mosley's termination) that was intended to cause an adverse employment action, and the act was a proximate cause of the adverse employment action.  Accordingly, and alternatively, Defendant may be held liable on this basis as well.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.  The District Court's grant of summary judgment to Defendant should be reversed because it expressly weighed the evidence to reach its conclusion that a reasonable jury *could not find,* based on the totality of the circumstances, that Defendant's decision to terminate Plaintiff was motivated by his race, opposite to the summary judgment requirement.**

It is well established that at the summary judgment stage, a judge's function is not to weigh the evidence but to determine if there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 249 (1986); see also, A.L. by and through D.L. v. Walt Disney Parks and Resorts US, Inc., 900 F.3d 1270, 1289 (11th Cir. 2018)* (holding that the court is not to weigh conflicting evidence on a

14

motion for summary judgment); *Skop v. City of Atlanta*, *485 F.3d 1130, 1140 (11th Cir. 2007)* (holding that a court "'may not weight conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied'").

In *Lewis v. School Board of Palm Beach County, Florida, 850 Fed. Appx. 674, 680 (11th Cir. 2021)*, this Court emphasized that "[a court's] function at summary judgment is not to weigh the evidence but to determine if there is a genuine issue for trial." In the present matter, the District Court did exactly what this Court cautioned should not occur at the summary judgment phase. It expressly weighed the evidence during its summary judgment evaluation. In its Order, the Court states that it considered "*mitigating circumstances* and *facts that militate against* finding that racial animus caused or influenced Plaintiff's termination" and in doing so, it "found that the totality of circumstances *could not* allow a reasonable jury to find that Defendant fired Plaintiff because he is Black." (Dkt. 91, p. 17.) (Emphasis added.) The District Court cited to *Banks v. MarketSource, Inc.*, *2020 WL 6291422, at \*7 (N.D. Ga. March 20, 2020)* for the proposition that the "convincing mosaic" method is in essence a "totality of the circumstances" analysis and, therefore, it "must encompass *all c*ircumstances." (Dkt. 91, pp. 16-17.) Irrespective of whether this is true, it does not permit the court to weigh the evidence before it when evaluating a motion for summary judgment.

In *Strickland v. Norfolk Southern Ry. Co.*, *692 F.3d 1151, 1157 (11th Cir.*
*2012)*, despite citing to the standard for summary judgment and Plaintiff's burden
concerning his claim that Defendant was liable for his injuries pursuant to the
Federal Employees Liability Act, the 11th Circuit ruled that because the District
Court improperly based its order upon Plaintiff's failure to identify the railcar on
which his injury occurred, the court's grant of summary judgment was improper.
The 11th Circuit held that "[t]he District Court misconstrued the issue before it.
Rather than considering the only question relevant to Norfolk Southern's motion
for summary judgment, whether there was evidence of an inefficient handbrake,
the Court instead considered whether Strickland's failure to identify the railcar was
fatal to his claim.  Such a consideration is improper in the context of a motion for
summary judgment." *Id. at 1158.*

Likewise, in the instant case, the District Court has misconstrued the issue
before it, which is whether there is sufficient circumstantial evidence in the record,
when considered as a whole and viewed in the light most favorable to Mr. Mosley,
to create a genuine issue as to whether the decision to terminate his employment
was motivated by his race.  Instead, the District Court considered all mitigating
and militating facts, just as the court did in *Strickland* when it considered and relied
upon the fact that Plaintiff failed to identify a railcar, as a basis for granting
summary judgment to Defendant. *Black's Law Dictionary* defines "mitigate" as

16

"to make less severe or intense; to make less harmful, unpleasant, or seriously bad." *Black's Law Dictionary* (11th ed., 2019). This inherently involves the weighing of facts. By stating that it considered mitigating and militating facts concerning whether racial animus caused or influenced Plaintiff's termination, the District Court clearly revealed that it weighed conflicting evidence. It then relied upon weighing this evidence in granting Defendant's motion for summary judgment. Consequently, the District Court committed a reversible error. *See Anderson, 477 U.S. at 249 (1986)* (holding that "it is clear . . . that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"); *see also Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012)* (holding that a court "'may not weight conflicting evidence or make credibility determinations of [its] own. If the record presents disputed issues of fact, the court may not decide them, rather [it] must deny the motion and proceed to trial'").

**II. If this Court does not reverse the District Court solely on the fact that it did not apply the correct summary judgment standard, then, by applying the correct standard, this Court should deny Defendant's motion for summary judgment on Plaintiff's claim that his race was a motivating factor in Defendant's decision to terminate his employment.**

In *Lewis, 850 Fed. Appx. at 680*, this Court concluded that although "there was substantial evidence in the record to support the [employer's] proffered

17

decision for [its adverse action,] the non-renewal decision," there was "sufficient circumstantial evidence in the record, considered as a whole and viewed in the light most favorable to Lewis, [to] create[] a genuine dispute of fact as to whether the [adverse action] was motivated by Lewis's race."

In the present case, there is significantly less evidence to support Defendant's proffered reason for its decision to terminate Mr. Mosley, and under mosaic standard, there is certainly sufficient circumstantial evidence in the record, considered as a whole and viewed in the light most favorable to Mr. Mosley, to create a genuine dispute of fact as to whether Defendant was motivated by Mr. Mosley's race concerning its decision to terminate his employment. *See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)* (holding that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker'").

a.  <u>Suspicious timing</u>

In March 2018, Defendant hired Jeff Lewis as its general manager, whom Defendant admittedly but mildly describes as having a "brusque management style" and a "quick temper" (Hammers Dec., ¶29; G. Preston Dep., ¶25). More accurately, Lewis' overt direct expressions of derision, aversion, and hostility concerning and toward African American employees and customers

18

revealed he held a cemented racial animus toward African Americans. Significantly, Mr. Lewis directed this animus specifically at Mr. Mosley. Mr. Moon testified that Mr. Lewis used derogatory racial tropes such as "shucking and jiving" to describe Mr. Mosley's labor. (Davis Aff., ¶4(a).) He also referred to Mr. Mosley as a "homeboy," a "street person," and "blacker than the rest." (Davis Aff., ¶4(c).) Mr. Davis also heard Mr. Lewis specifically insulting Mr. Mosley by saying he looked like he was someone from the street because of the loose and baggy clothes he wore to work. (Davis Aff., ¶4(b).)

Within a month after openly expressing this racially hostile mindset directly concerning Mr. Mosley, Mr. Lewis fired Mr. Mosley, an African American and the Dealership's top-selling motorcycle sales associate. Next, the day after Mr. Mosley's termination, Mr. Lewis openly admitted that the type of clothes Mr. Mosley wore to work—which he had previously criticized, saying that Mr. Mosley looked like someone from the street—was a motivating factor in his decision to recommend terminating Mr. Mosley's employment. Significantly, the person who heard him make this statement, Mr. Previte, reached a conclusion that Mr. Lewis' comment was racially incendiary.[2] (Previte Dep., p. 20.) In conclusion, the timing

---

[2] Mr. Previte was familiar with Mr. Lewis' aversion to African Americans, including the types of clothing he commonly saw them wear, as one day, while at work, Mr. Lewis cornered him on the way out of the bathroom and, after physically blocking him, told him that his clothing did not fit the culture of the Dealership and that he looked like one of the Dealership's customers, which was a predominately African

of Mr. Mosley's departure from the Dealership, combined with Mr. Lewis' actions preceding it, serves as evidence that a reasonable jury could rely upon under the convincing mosaic of circumstantial evidence to conclude that Defendant's decision to terminate his employment was motived by Mr. Mosley's race.

      b. <u>Other evidence from which an inference of discrimination can be drawn or bits and pieces of evidence</u>

In addition to expressions of derision, aversion, and hostility made by Mr. Lewis directly concerning Mr. Mosley, Mr. Lewis expressed a similar mindset toward African American customers. Ms. Landis, an employee of the Dealership ,filed a complaint with Human Resources about Mr. Lewis on May 25, 2018, shortly after his arrival. (Mosley Dep., Exh. 27 and Previte Dep., p. 29). In her complaint, Mr. Landis complained that Mr. Lewis asked her if a customer was white or Black, and she viewed his behavior to be offensive and an act of racial profiling. (Mosley Dep., Exh. 27.)

Mr. Previte corroborates Ms. Landis' observations concerning Mr. Lewis' racially hostile remarks about African American customers. During his employment at the dealership, he witnessed Mr. Lewis frequently asking Ms. Landis about the race of a customer. During his deposition, he testified as follows:

    "Very frequently, a customer would have to require [sic] paystubs

American clientele. (Previte Dep., pp. 17-18.)

> in order to prove to the bank that they were the employee of that income. I heard Jeff ask one of the sales managers, [ ] Tammy, what the color of the customer's skin was. You know, he was trying to infer, [ ] whether or not the customer was reliable enough to come back or produce the paystubs." (Previte Dep., pp. 11-12.)

Lewis' racial comments, irrespective of whether they were all directed at Mr. Mosley, serve as circumstantial evidence to support an inference of discrimination. *See White v. Dixie, 741 Fed. Appx. 649, 657 (11th Cir. 2018) citing to Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998)* and *Ash v. Tyson Foods, 546 U.S. 454, 456 (2006).* Accordingly, Mr. Lewis' racially tinged and derisive remarks serve as evidence that a reasonable jury could rely upon under the convincing mosaic of circumstantial evidence to conclude that Defendant's decision to terminate his employment was motived by Mr. Mosley's race.

   c. <u>Defendant's reasons for Plaintiff's termination are ambiguous and pretextual</u>

A review of the whole record reveals that Defendant has presented a variety of shifting and changing reasons for its termination of Plaintiff's employment. In an affidavit, Gene Preston, the owner, contends that Plaintiff was terminated because of Plaintiff's alleged *ongoing poor attitude and refusal to follow his supervisor's directions and act as a member of the sales team as a whole.* (G. Preston Dec., ¶30.) (Emphasis added.) Similarly, in an affidavit, Mr. Hammers, the Dealership's assistant sales manager, attests that "[o]n April 18, 2018, Plaintiff was informed that

the Dealership could no longer employ him because of his ongoing conduct and poor attitude." (Hammers Dec., ¶33.)

Significantly, Defendant's proffered termination reasons are contradicted by Mr. Mosley's immediate manager, Clarence Moon, who avers that based on his personal experience of managing Mr. Mosley, he was an "exemplary employee" who would "often go above and beyond the call of duty to perform his primary job, which was to sell motorcycles." (Moon Aff., ¶5.) Mosley likewise refutes Defendant's contention that he had an uncooperative attitude and testified at his deposition that he did make phone calls per instructions received by him from Hammers. (Mosley Dep., pp. 54:21-55:6.)

Also significant is the fact that although Defendant supposedly had specific tangible reasons for terminating Mr. Mosley's employment, the termination letter signed by Gene Preston provides *no reason whatsoever* for Mosley's termination. (Mosley Dep., Exh. 20.) (Emphasis added) Moreover, Mr. Mosley testified that during the termination meeting, when he asked Mr. Hammers why he was being let go, Mr. Hammers responded, "We are moving in a different direction." Mr. Mosley then asked, "What did I do?" Mr. Hammers responded, "*You didn't do anything. We are just moving in a different direction.*" (Mosley Dep., p. 156.) (Emphasis added.)

Next, the day after Mr. Mosley was terminated, yet another reason was

advanced for terminating Mr. Mosley's employment.  Following a morning meeting, Mr. Lewis openly admitted that the type of clothes Mr. Mosley wore to work—which he had previously criticized, saying that Mr. Mosley looked like someone from the street—was a motivating factor in his decision to recommend terminating Mr. Mosley's employment.  (Previte Dep., p. 11.)  Lastly, following his termination, Mr. Mosley applied for unemployment benefits with the GDOL.  On April 22, 2018, GDOL issued a determination that concluded: "Your employer fired you.  The available facts show that you were performing the duties for which you were hired.  The facts show that you did not fail to follow employer's rules, orders, or instructions."  (G. Preston Dep., Exh. 13.)

In summary, the reasons proffered by Defendant for terminating Mr. Mosley's employment contain weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions; thus, sufficient circumstantial evidence is in the record, considered as a whole and viewed in the light most favorable to Mr. Mosley, to create a genuine dispute of fact as to whether Defendant was motivated by his race concerning its decision to terminate his employment. *See Thomas v. Home Depot USA, Inc., 731 Fed. Appx. 889, 893 (11th Cir. 2019)* (holding that when conducting an inquiry as to whether an employer's proffered reasons for its adverse action are pretext, the court must determine "'whether the plaintiff has cast sufficient doubt on the defendant's proffered reasons to permit a reasonable factfinder to conclude that the employer's

proffered legitimate reasons were not what actually motivated its conduct.'").

     d. <u>Defendant's general manager's racial hostility and animus toward Mr. Mosley resulted in a biased recommendation that was followed by the final decision-maker without independent investigation</u>

     1.    *Cat's paw vicarious liability*

Sufficient evidence exists that would allow a jury to conclude that Mr. Lewis made a biased recommendation to Mr. Preston, and it was followed without independent investigation by Mr. Preston concerning each reason recommended for Mr. Mosley's termination.

"When a claim involves an adverse employment action that occurs based on a biased recommendation by a party without decision-making authority, a plaintiff can establish liability under the cat's paw theory." *See Holley v. Georgia Department of Corrections, 845 Fed. Appx. 886, 889-890 (11th Cir. 2021) (citing to Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-1332 (11th Cir. 1999).*

Under the cat's paw theory, "if the decision-maker followed the biased recommendation without independent investigation—essentially rubber-stamping the biased recommendation—then the recommender's discriminatory animus is imputed to the decision-maker." *See Stimpson, 186 F.3d at 1332.* Notwithstanding, if an employer independently investigates the recommended grounds for termination before making an adverse employment decision, it should not be held liable for another employee's hidden discriminatory motives. *See*

*Llampallas v. Mini-Circuits Lab, Inc., 163 F.3d 1236, 1249-1250 (11th Cir. 1998)*

(holding that "[w]hen the employer makes an effort to determine the employee's

side of the story before making a tangible employment decision affecting that

employee, however, it should not be held liable under Title VII for that decision

based only on its employee's hidden discriminatory motives").

Mr. Lewis indeed made a recommendation to Mr. Preston to terminate Mr.

Mosley's employment.  At his deposition, Mr. Preston testified as follows:

> "[Question]: And how did you—was there a recommendation made
> to you to terminate Mr. Mosley's employment?  [Answer]: Yes, sir.
> [Question:] And who did that recommendation come from?
> [Answer:] To me, it would have been directly from the general
> manager and the general sales manager.  They would have—they
> jointly presented their concerns and their case for us separating.
> [Question:] And to the best of your recollection, what concerns did
> the general manager, who I assume was Jeff Lewis—[Answer:] Yes,
> sir."  (G. Preston Dep., p. 32.)

Mr. Preston further testified that the reasons Mr. Lewis provided to him for

Mr. Mosley's termination were supposedly "excessive tardiness, excessive

absenteeism, unwillingness to cooperate as part of a team in training sessions and

generally not participating in day-to-day routine operation of the Dealership."  (G.

Preston Dep., pp. 32-33.)   Significantly, there is no evidence that Mr. Preston

independently investigated each reason Mr. Lewis told him he was relying upon for

his recommendation to end Mr. Mosley's employment with the Dealership or

determined Mr. Mosley's side of the story before making the final decision to

terminate his employment.  Consequently, there is sufficient circumstantial evidence in the record, considered as a whole and viewed in the light most favorable to Mr. Mosley, to create a genuine dispute of fact as to whether Defendant was motivated by his race concerning its decision to terminate his employment.

## 2.    *Cat's paw proximate cause liability*

Alternatively, there is sufficient evidence to conclude that as a supervisor, Mr. Lewis performed an action motivated by animus (i.e., recommending Mr. Mosley's termination) that was intended to cause an adverse employment action, and the act was a proximate cause of the adverse employment action.  As such, Defendant may be held liable under this variation of the cat's paw theory as well.

In *Staub v. Proctor Hospital, 562 U.S. 411, 416 (2011)*, the Supreme Court applied the cat's paw theory in the context of a Uniformed Services Employment and Reemployment Rights Act employment discrimination claim.   The Court concluded that, under the cat's paw theory, an independent investigation did not relieve an employer of fault. *See id. at 420* (stating that "[w]e do not think that the ultimate decision-maker's exercise of judgment automatically renders the link to the supervisor's bias 'remote' or 'purely contingent'").  Instead, the Court held that discriminatory animus may be imputed to a neutral decision-maker under a cat's paw theory if: (1) a supervisor performed an act motivated by animus that was intended to cause an adverse employment action, and (2) the act was a proximate cause of the

26

adverse employment action. Under these circumstances, an employer may be held liable. *See id. at 422.* In *Holley v. Georgia Department of Corrections, 845 Fed. Appx. 886, 889-890 (11th Cir. 2021)*, this Court recognized the proximate cause variation of cat's paw liability.

In the present matter, as general manager of the Dealership, Mr. Lewis was a supervisor. (Preston Dec., ¶24.) The record contains evidence that he openly expressed racial animus directly concerning Mr. Mosley both pre and post termination. (Davis Aff., ¶4; Previte Dep., p. 11.) Mr. Preston admits receiving a recommendation from Mr. Lewis and thereafter having a termination letter prepared to present to Mr. Mosley. (G. Preston Dep., pp. 31-32.) As such, Mr. Lewis' recommendation was a proximate cause of Mr. Mosley's termination from employment. Further substantiating the fact that Mr. Lewis was the proximate cause of Mr. Mosley's termination is the fact that the following day, Mr. Lewis openly commented to Mr. Previte and other employees about terminating Mr. Mosley from the Dealership. (Previte Dep., p. 11.) Consequently, there is sufficient evidence from which a jury could reach a finding that Mr. Lewis performed an act motivated by animus that was intended to cause an adverse employment action (i.e., Mr. Mosley's termination from employment). Moreover, there is sufficient circumstantial evidence in the record, considered as a whole and viewed in the light most favorable to Mr. Mosley, to create a genuine dispute of fact as to whether Defendant was motivated by

27

his race concerning its decision to terminate his employment.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the judgment of the District Court should be reversed.

Respectfully submitted this 16th day of November, 2021.

*/s/Jermaine A. Walker*
Jermaine "Jay" A. Walker
HKM Employment Attorneys LLP
3355 Lenox Rd., Suite 705
Atlanta, GA 30326
Telephone: (404) 301-4020
Attorney for Plaintiff-Appellant

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Plaintiff-Appellant certifies that this document complies with the type-volume limit of Fed. R. App. P. Rule 32(a)(7)(B) and the page limit of Fed. R. App. P. Rule 32(a)(7)(A), excluding the parts of the document exempted by Fed. R. App. P. Rule 32(f):

1.    This document contains 6585 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type-style requirements of Fed. R. App. P. Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using a Microsoft word-processing program in 14-point Times New Roman font.

Dated November 16, 2021.

*/s/Jermaine A. Walker*
Jermaine "Jay" A. Walker
HKM Employment Attorneys LLP
3355 Lenox Rd., Suite 705
Atlanta, GA 30326
Telephone: (404) 301-4020
Attorney for Plaintiff-Appellant

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have e-filed today, November 16, 2021, the above

and foregoing by utilizing the Court's CM-ECF system, with copies being served

on counsel of record for Defendant-Appellee:

Meredith Riggs Guerrero
Georgia Bar No. 214274
MGuerrero@deflaw.com

Megan Mathews Noble
Georgia Bar No. 477009
Mnoble@deflaw.com

DREW ECKL & FARNHAM, LLP
303 Peachtree Street, NE - Suite 3500
Atlanta, Georgia  30308
Telephone:  (404) 885-1400
Facsimile:   (404) 876-0992

Respectfully submitted this 16th day of November, 2021.

*/s/Jermaine A. Walker*
Jermaine "Jay" A. Walker
HKM Employment Attorneys LLP
3355 Lenox Rd., Suite 705
Atlanta, GA 30326
Telephone: (404) 301-4020
Attorney for Plaintiff-Appellant